UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HENKEL OF AMERICA, INC.,

              Plaintiff,                        Case Number 17-13909

v.                                           Honorable David M. Lawson

CRAIG M. BELL and KNIGHT CAPITAL
PARTNERS CORP.,

              Defendants.

_____/

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Defendant Craig Bell was employed in upper management by Henkel Corporation (Henkel US) until he left that job to work for defendant Knight Capital Partners. Henkel US's parent, plaintiff Henkel of America, Inc., says that Bell breached certain non-compete and non-disclosure clauses in his employment contract with Henkel US, claims that it is a co-party to that contract, and seeks to recoup the salary and benefits Henkel US paid to Bell. Plaintiff Henkel America also accuses Knight of tortiously interfering with Bell's employment contract with Henkel US and aiding Bell in breaching his employment contract. The defendants have moved for summary judgment of dismissal of all nine counts of the complaint save one: Count V, alleging that Bell breached a fiduciary duty. On most of the counts of the complaint, Henkel America has not presented evidence that Bell breached his employment contract, and on the remaining counts it has not shown that it suffered damages caused by the defendants' conduct. The Court will grant the motion for summary judgment and dismiss the complaint except for count V, which has not been addressed by the parties.

## I. Facts and Proceedings

It is fair to say that this lawsuit is an outgrowth of an action that Knight brought against Henkel America's (and Henkel US's) German parent corporation, Henkel AG & Co., KGaA (Henkel Germany), for scuttling a joint venture Knight was negotiating with Henkel US to develop and market products using technology that Knight said it controlled. Before those negotiations imploded in the summer of 2015, Bell left Henkel US and took a job with Knight. The Court dismissed the earlier case, *Knight Capital Partners Corp. v. Henkel AG & Co., KGaA*, No. 16-12022, 2018 WL 4931990 (E.D. Mich. Oct. 11, 2018), but not before Henkel America filed this virtual countersuit.

Henkel America accuses Bell in this case of secretly moonlighting with Knight before he formally left Henkel US at the end of 2014, which allegedly violated certain provisions of Bell's employment contract to Henkel America's disadvantage. The facts, as the parties present them, do not support those claims.

### A. Background

The underlying context of the dispute is familiar to the parties and was discussed at length in the Court's opinion granting Henkel's motion for summary judgment in the related case. *Knight Capital Partners*, 2018 WL 4931990 at *1-3. A shorter version is that in February 2014, Knight held a global license granted to it by AI Sealing, LLC (AIS), a Texas company that purported to possess the patent rights for a "revolutionary" series of citrus-based compounds developed for cleaning dirty equipment at oil rigs and refineries. Knight approached Henkel US to explore the possibility of a deal for marketing and distributing products based on the new technology. In an attempt to reach a deal, the parties engaged in lengthy negotiations, which persisted over several months. Beforehand, however, Henkel US and Knight entered into a non-disclosure agreement.

The negotiations eventually broke down, and subsequently Knight sued Henkel US's prime global parent — Henkel Germany — for tortious interference in the scuttled deal with Henkel US. However, discovery in the case did not bear out Knight's allegations that Henkel Germany had exploited the negotiations for its own economic advantage, principally because the proofs offered no support for the plaintiff's claim that Henkel had exploited the relationship to circumvent Knight and procure a licensing deal directly with its technology holder, AIS.

### B. Craig Bell's Employment with Henkel

Bell worked for Henkel US, a subsidiary entity wholly owned by Henkel of America, Inc., for 22 years, rising to the rank of Vice President of Henkel US's Adhesive Technology division. When he was promoted to the position of Vice President at Henkel US in September 2010, Bell signed an employment contract that included several provisions governing his conduct; among them were nondisclosure and noncompetition clauses. The offer letter that Bell counter-signed stated that his employment would be "at will," meaning "you, or the Company can terminate your employment at any time for any reason or no reason."

By signing the "Non-Solicitation & Non-Competition Agreement," Bell agreed that during his employment by Henkel US and for 12 months after it ended he would not be employed by any "Competitive Entity," which was defined to mean "any business which manufactures, produces, sells or markets products or services that are competitive with any Henkel products, services and/or business: (i) that you worked with, sold, developed, marketed or handled; (ii) about which you had access to trade secrets or confidential information; or (iii) for which you provided shared services support, at any time during the last 24 months of your employment."

Under a separate "Non-Disclosure & Invention Assignment Agreement," Bell agreed "to use [his] best efforts during [his] employment with [Henkel] and to not engage in outside

employment or business interests that detract from [his] performance for [Henkel], or that create an actual or potential conflict of interest." Bell also agreed that during and after his employment he would not "directly or indirectly [] disclose, utilize, or authorize any disclosure of Confidential Information," which was exhaustively enumerated as comprising:

> (i) customer lists, vendor information, and customer information as compiled by [Henkel], including, but not limited to, contacts, preferences, orders, product usage, product volumes, pricing, promotions, sale and contract terms, and contract expiration dates; (ii) internal practices and procedures, compensation and payroll information, personnel data, and recruitment activities; (iii) financial condition and financial results of operations; (iv) supply of materials information, including sources and costs; (v) information relating to designs, formula, development or experimental work, know-how, products, processes, computer programs, source codes, data bases, schematics, inventions, creations, original works of authorship, or other subject matter relating to research and development, strategic planning, manufacturing, engineering, purchasing, finance, marketing, promotion, distribution, licensing, and selling activities; and (vi) any and all information, without regard to form, having independent economic value to [Henkel] that is not generally known to, and not readily ascertainable by proper means by a person who can obtain economic value from its disclosure or use.

Although Bell worked for Henkel US, both the nondisclosure and noncompetition agreements stated that they were "entered into by and between Henkel of America, Inc. and each of its subsidiaries, divisions, associated or affiliated companies [and] Craig Bell."

### C. The Henkel — Knight Negotiations

Bell was friends with Knight's CEO, Fadi Nona. In late 2013 he introduced Nona to principals at Henkel US with the hope of generating a deal between the two companies to develop the refinery cleaning products. As the negotiations progressed, Bell also "coached" Nona on the best means of presenting and advancing the deal through Henkel's corporate hierarchy, which as a sales executive was a function that he often performed when seeking to broker a deal with an outside partner. It is undisputed that Bell's relationship and activities with Nona were well known among Bell's Henkel colleagues.

Bell attested that he had been specifically trained by consultants Henkel engaged to provide this sort of "facilitation" for negotiations with potential business partners. He said that offering services such as "editing [Knight]'s email communication [and] providing guidance regarding how to best communicate with Henkel's leadership team" were things he was taught to do and understood were appropriate in his role as a Henkel executive. However, Bell asserts that he was not involved as a direct advocate for Knight in the negotiations until after he left Henkel US's employment. He contends that nearly all of his time during most of the negotiations was consumed by a hectic schedule managing numerous other products within his purview, which required, among other things, 39 trips to domestic and global Henkel locations during 2014, and supervision of 16 members of the team of senior managers who reported to him. Those points are unrebutted as well.

Bell also worked extensively to facilitate the transition of his duties after he gave Henkel notice of his resignation on November 4, 2014. His last day of work was January 5, 2015.

On the same day that Bell gave his notice, Henkel US's VP of Marketing, Mike Quail, circulated an email to a handful of Henkel executives in which he relayed his understanding of why Bell had tendered his resignation:

> [Craig is leaving to go to work for a company] owned by his personal friend, [which is] the venture capital group who has invested in the cleaner (refinery) that MRO is looking at. Craig connected the opportunity to represent the technology to Ken and Zubin for MRO. His friend knows nothing about the chemical industry, so [he] hired Craig to manage this particular venture for his company, with or without Henkel's involvement. Don't know . . . don't think that this is a compliance issue.

Bell attested that he never received any negative commentary or reprimands throughout his last year. He says that he was commended for his exemplary performance, which included initiating and completing several major projects in his division and closing a deal with an outside partner (not Knight) with projected sales of $35 million in the first two years — according to Bell,

the largest such deal for his division in 2014.  He also received a substantial performance incentive bonus for 2014, which was based on success metrics for Henkel and its various subdivisions related to the adhesives business; in particular, Bell was rewarded for achieving 120% of the "team goal" for his immediate area of responsibility.

### D. Bell's Employment with Knight

Bell attested that he began his new position as Chief Operating Officer (COO) for Knight on January 6, 2015.  He asserts that he never was offered, nor would he have accepted, any sort of "kickback" or other compensation from Knight for anything that he did in his limited role as a "facilitator" for the negotiations between his former and current employers.  However, Henkel America points to a memorandum produced by the defendants, of unknown provenance, which appears to embody terms for distribution of initial revenue from the Henkel-Knight deal, including a line item for $250,000 allocated to "Craig," which Henkel America contends was a contingent bonus that Knight offered him, to be paid upon consummation of the deal.

Henkel America also identified several emails in the record, which, it claims, show that Bell actually began working for Knight months before he formally resigned.  In a message sent March 30, 2014, Bell wrote to Knight's CEO, Fadi Nona: "Take a look at the proposal I put together.  Obviously this cannot have come from me.  We can discuss and adjust as needed."

In another message sent on August 29, 2014, Bell wrote to Nona and Marsha Feltingoff, a Vice President at Knight, describing the details of a licensing and royalty model for the proposed deal.  He stated: "As you know, the deal with Henkel isn't yet done.  We can ask for whatever we want.  I think they are expecting a deal where they would get some territorial exclusivity for meeting minimum commitments.  They would pay a royalty on every gallon sold."  That email message indicated that Bell was using the address "cbell@kcpcorp.com" during his exchanges

with Knight executives. It also included a signature block at the bottom that indicated Bell's title as "Craig Bell | COO, Knight Capital Partners."

On September 24, 2014, in an email to Nona and Feltingoff sent at 1:01 a.m., Bell quipped, "Have a good night everyone, Job #1 starts in 2 min!" Melvin Babi, Knight's General Counsel, responded and wrote: "Lol Craig, I wish I was getting paid by the hour or better yet getting a comfy pay check every 2 weeks from Henkel. And don't worry your [sic] not a convict in my eyes."

In a Knight-prepared slide presentation from January 2015, Bell is identified as Chief Operating Officer responsible for "Strategic Business Development," and "Global Chemicals & Adhesives." The presentation represents that Knight is an "[o]wner of intellectual property . . . focused on environmentally safe and sustainable processes." The presentation boasted that "Knight offers a full line of chemistry used in the refinery and power plant maintenance process to improve up-time, environmental sustainability and worker safety." It enumerated products in the "[Knight] Refinery and Power Plant Maintenance Portfolio" including "Biocide," "WT-Guard," "Citrus Salt," "AI-22," and "Blast-It," touted as useful for cleaning, degreasing, descaling, disinfecting, or removing "build-up" on refinery equipment.

Henkel America contends that the above evidence establishes that Bell breached the terms of his employment agreement in numerous ways, but the only evidence that it points to in addition to the several communications noted above is a single passage from the deposition of a Henkel executive, Robert McNamee, in which McNamee asserted that:

> During the last year of Mr. Bell's employment, he engaged in a number of activities that hurt Henkel, including hiding information that he should have had a duty to share with Henkel, disclosing Henkel confidential information that he had a duty not to disclose, and repeatedly engaging in actions to the detriment of Henkel and for the benefit of himself and Knight Capital Partners.

Henkel America's evidence does not extend beyond these generalities.  It does not point to any documents in the record or any other specific information that it contends constituted confidential material disclosed by Bell to Knight.

Henkel America asserts that the alleged breaches of the employment agreement "caused hundreds of thousands of dollars in damages," but it identifies nothing more than the compensation it paid Bell.  Henkel America says that it "financed the health and welfare benefits that Mr. Bell enjoyed while secretly moonlighting with [Knight] against [Henkel America]'s interest."  It also alleges that "[d]uring that time, Mr. Bell also received a substantial bonus pursuant to the Henkel of America, Inc. Short-Term Incentive Plan, and participated in the Henkel of America Retirement Plan (the 'HOA RP') and the Henkel of America Investment Plan (the 'HOA IP')."  Henkel asserts that "Mr. Bell's compensation from Henkel Corp. — which he should not have been paid while in breach of his employment agreements — necessarily harmed [Henkel]," because Henkel "was deprived of the benefit of Mr. Bell's employment by his doubledealing [*sic*] with [Knight]."

### E. Procedural History

Henkel America filed its complaint on December 5, 2017, pleading claims against Bell individually for (1) breach of the noncompetition agreement (Count I); (2) breaches of the nondisclosure agreement (Counts II and III); (3) breach of the prohibition on outside employment comprising any conflict of interest (Count IV); (4) breach of the "fiduciary duty of candor and loyalty" (Count V); and (5) unjust enrichment (Count IX).  The complaint also pleads claims against Knight for (1) tortious interference with the contract of employment between Henkel and Bell (Count VI); and (2) aiding and abetting the pleaded violations of the nondisclosure and noncompetition provisions (Counts VII and VIII).  Discovery closed on July 30, 2018.

The defendants moved for summary judgment, asking that the complaint be dismissed in its entirety. However, other than an omnibus standing argument, they did not present any argument challenging Count V, which alleged a breach of a fiduciary duty. Henkel America opposes the motion, but, predictably, it did not address that count in its brief either.

## II. Discussion

The defendants moved for summary judgment under Federal Rule of Civil Procedure 56(a). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627 (6th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "The moving party bears the burden of showing that no genuine issues of material fact exist," and it "must demonstrate the 'basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* at 627-28 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

To oppose that showing, "[t]he nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 628 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). The opposing party must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The submitted materials need not themselves be in a form that is admissible in evidence. *Celotex*, 477 U.S. at 324.

"The reviewing court must then determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pittman*, 901 F.3d at 628 (quoting *Anderson*, 477 U.S. at 251-52). In doing so, the Court must "view the facts and draw all reasonable inferences in favor of the non-moving party." *Ibid.* (quoting *Matsushita*, 475 U.S. at 587).

This case is here under the Court's diversity jurisdiction, so the Court must "apply the same law that [the] state courts would apply." *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715 (6th Cir. 2018) (citing *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997)); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). That law usually comes from the state's highest court. *Auburn Sales, Inc.*, 898 F.3d at 715. "And where [the state's intermediate] appellate courts have spoken in the Supreme Court's absence, we will normally treat those decisions as authoritative absent a strong showing that the [state's Supreme Court] would decide the issue differently." *Ibid.* (quotations omitted). "In this latter scenario, we must also look to other available data, such as Restatements, treatises, law reviews, jury instructions, and any majority rule among other states." *Ibid.* The parties agree that Connecticut law governs the breach of contract claim, based on the employment agreement's choice-of-law provision.

## A. Standing

The defendants contend that plaintiff Henkel America has no standing to bring this lawsuit because Bell directly was employed by Henkel US, not Henkel America. They reason that Henkel US is the real party in interest in the litigation; Henkel America therefore cannot pursue any of the claims premised on alleged breaches of the employment contract.

That argument conflates the two concepts of Article III standing and the real-party-in-interest rule. *See Zurich Ins. Co. v. Logitrans, Inc*. 297 F.3d 528, 532-33 (6th Cir. 2002) (noting that courts "acknowledge[] that there is a distinction between questions of Article III standing and . . . real party in interest objections"). To establish standing under Article III of the Constitution, a plaintiff must have suffered an "injury in fact" that is concrete and particularized and "actual or imminent," must show a causal connection between the injury and the defendant's conduct, and demonstrate that the injury will be redressed by a "favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). Federal Rule of Civil Procedure 17(a) states that "[a]n action must be prosecuted in the name of the real party in interest." "The real party in interest analysis turns upon whether the substantive law creating the right being sued upon affords the party bringing the suit a substantive right to relief." *Certain Interested Underwriters at Lloyd's, London, England v. Layne*, 26 F.3d 39, 43 (6th Cir. 1994).

The plaintiff has demonstrated both Article III standing and status as a party entitled to sue on the agreements. The defendants' position is not supported by the record, because the employment contracts between Bell and Henkel expressly defined the parties to the agreements as: "Henkel of America, Inc. *and each of its subsidiaries, divisions, associated or affiliated companies* [and] Craig Bell." (Emphasis added). It is settled law in Connecticut that "[f]or a plaintiff to have standing to bring an action seeking damages for breach of contract, he must allege and prove that he was a party to the contract and, thus, was entitled to enforce the contract for his own benefit, and that the other party's breach of the contract caused him to suffer damages in his individual capacity." *Bongiorno v. Capone*, 185 Conn. App. 176, 196, --- A.3d ---, --- (2018). Moreover, under Rule 17(a), "[t]he following may sue in their own names without joining the

-11-

person for whose benefit the action is brought: . . . a party with whom or in whose name a contract has been made for another's benefit."  Fed. R. Civ. P. 17(a)(1)(F).

In this case the parties to the agreements referenced in the complaint — the literal terms of which are not seriously in dispute — expressly included both plaintiff Henkel of America, Inc., and all its corporate subsidiaries.  It also is undisputed that Henkel US, Bell's actual employer, was one such subsidiary (wholly owned by the plaintiff).  The plaintiff is a proper party to bring this suit.

### B.  Breach of Contract (Counts I-IV)

The defendants argue that Henkel America has not established a breach of any of Bell's employment agreement provisions because (1) there is no evidence in the record that Bell was employed by Knight before he resigned from Henkel US; (2) Henkel of America, Inc. has not demonstrated that it sustained any damages as a result of any of the misconduct alleged, because Bell was employed and his salary and benefits were paid by Henkel US, which is a separate corporate entity from its parent, Henkel America; and (3) Henkel has not demonstrated that it suffered any other damages or economic harm beyond its claims for disgorgement of Bell's salary and benefits during the period of alleged wrongdoing.  Henkel America disputes each of these arguments and believes it has a case that can be submitted to a jury.

The applicable law is straightforward.  Under Connecticut law, "[t]he elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages.'"  *Bongiorno*, 185 Conn. App. at 196 (quoting *CCT Communications, Inc. v. Zone Telecom, Inc.*, 327 Conn. 114, 133, 172 A.3d 1228, 1240 (2017)).

### 1. Nondisclosure Agreement

The claims for breach of the nondisclosure agreement cannot be sustained because the plaintiff has failed to identify any information that Bell allegedly disclosed which could fall into any of the exhaustively enumerated categories listed in section 4(b) of the nondisclosure agreement. Instead, the plaintiff relies on the conclusory attestation of its witness, Robert McNamee, who asserted without elaboration that "[d]uring the last year of Mr. Bell's employment, he engaged in a number of activities that hurt Henkel, including . . . disclosing Henkel confidential information that he had a duty not to disclose." Robert McNamee dep. at 12, ECF No. 40-19, PageID.1172. But McNamee's testimony did not identify a single document or item of information that Bell allegedly disclosed, so a jury could not reasonably assess any such material to determine if it fell within the definition in section 4(b) of the agreement. Nor did any other witness furnish this critical information. The plaintiff therefore has not identified sufficient record evidence to establish the element of breach for its breach of contract claims premised on this agreement.

### 2. Noncompetition Agreement

For similar reasons, the plaintiff also cannot prevail on its claims for breach of the noncompetition agreement: it has failed to identify any product marketed or line of business engaged in by the defendants fitting within the precisely delineated terms of section 3.1 of the Non-Solicitation & Non-Competition Agreement. That agreement prohibited Bell from being employed by any "Competitive Entity," which was defined to mean "any business which manufactures, produces, sells or markets products or services that are competitive with any Henkel products, services and/or business: (i) that you worked with, sold, developed, marketed or handled; (ii) about which you had access to trade secrets or confidential information; or (iii) for which you

provided shared services support, at any time during the last 24 months of your employment." Non-Competition Agreement ¶ 3.1, ECF No. 40-2, PageID.960.

The plaintiff vaguely asserts that Knight was or is its "competitor," but, again, because it has not identified a single allegedly competitive product or line of business promoted in by both parties, the jury would be left with no foundation on which to assess whether any such product or line of business comprised any trade secrets or confidential information to which Bell had access, or embraced any functional area in which Bell worked while he was employed at Henkel US. Moreover, the record submitted by the plaintiff suggests that Bell's entire duties at Henkel US concerned the marketing of adhesives, while the defendants, at least during the pertinent time frame, were engaged in licensing various solvents or cleaning compounds. The plaintiff has not explained how those product areas or their target markets even marginally overlapped.

### 3. Conflict of Interest

The plaintiff has put forth sufficient evidence to sustain at least the breach element of its claims for breach of the condition that required Bell to refrain from any outside employment that could give rise to an actual or potential conflict of interest. The jury reasonably could conclude from the record submitted that Bell and others at Knight viewed his work with Knight, which may have commenced as early as March 2014, as a "second job," in which his primary goal was to facilitate a lucrative licensing deal between Knight and Henkel. The evidence also suggests that Bell expected to receive a bonus payment of $250,000 if the deal was consummated. Those facts are certainly adequate to suggest that, by playing both sides of the table, Bell was involved in self-dealing of the sort that a jury reasonably could view as creating an actual or potential conflict of interest.

However, this claim fails for another reason — one which also applies to all of the other claims of breach of contract and breach of duty — discussed further below: the plaintiff cannot establish that any of its alleged damages were proximately caused by any alleged breach.

### 4. Causation and Damages

"It is well established that the '[d]etermination of damages necessarily contemplates a finding that the breach was the cause of the damages claimed.'" *Bruno v. Whipple*, --- A.3d ---, No. 40282, 2018 WL 6288175, at *7 (Conn. App. Ct. Dec. 4, 2018) (quoting *West Haven Sound Development Corp. v. City of West Haven*, 541 A.2d 858, 861 (Conn. 1988)); *see also Calig v. Schrank*, 426 A.2d 276, 278 (Conn. 1979) ("It is hornbook law that to be entitled to damages in contract a plaintiff must establish a causal relationship between the breach and the damages flowing from that breach."); *Meadowbrook Center, Inc. v. Buchman*, 90 A.3d 219, 226 (Conn. App. Ct. 2014) ("[P]roof of causation more properly is classified as part and parcel of a party's claim for breach of contract damages."). "'The test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries.'" *Sun Val, LLC v. Commissioner of Transportation*, 193 A.3d 1192, 1205-06 (Conn. 2018) (quoting *Ugrin v. Town of Cheshire*, 54 A.3d 532, 539 (Conn. 2012)). "'The existence of the proximate cause of an injury is determined by looking from the injury to the [wrongful] act complained of for the necessary causal connection.'" *Id.* at 1206. "'This causal connection must be based upon more than conjecture and surmise.'" *Ibid.*

The only damages Henkel America has identified are the salary, bonus, and benefits Henkel US paid to Bell under his employment contract. However, as a general rule, the courts reject attempts by a plaintiff to disgorge ordinary compensation of a former employee absent a showing that the allegedly improper conduct either (1) precipitated a windfall for the defendant in inflated

or extraordinary compensation; or (2) substantially deprived the plaintiff of the benefit of the employee's performance of his usual duties. S*ee Marsteller v. ECS Fed., Inc.*, No. 13-593, 2013 WL 4781786, at *10 (E.D. Va. Sept. 5, 2013); *see also In re Capital One Derivative Shareholder Litigation,* 952 F. Supp. 2d 770, 783 (E.D. Va. 2013); *In re Pfizer Inc. Shareholder Derivative Litigation,* 722 F. Supp. 2d 453, 465-66 (S.D.N.Y. 2010). In this case the plaintiff has not offered any evidence to demonstrate either of those types of causal connections.

In *Marsteller*, the district court confronted substantially identical facts and rejected a claim for unjust enrichment advanced on the same theory of recovery that Henkel America has pursued here. The Court held that no causal link could be shown between the employee's alleged breach of a nondisclosure clause and the receipt of her usual compensation. *Marsteller*, 2013 WL 4781786, at *9-10 (finding that the employer in that case "fail[ed] to allege any 'causal relationship' between Marsteller's allegedly wrongful activities with regards to proprietary and confidential information and her "ordinary compensation." Notably, the court observed that the essential causal link could not be established for a recovery premised on either unjust enrichment or breach of fiduciary; the standard for establishing causation for a breach of contract claim is not materially distinguishable.

In *Capital One*, another Virginia district court observed on a similar record, that even assuming some wrongdoing occurred, recovery is not allowed where there is no showing that the breach caused the plaintiff either to receive some exceptional compensation or to fail in performing some material component of his usual duties. *In re Capital One Derivative Shareholder Litig.*, 952 F. Supp. 2d at 783 (finding that "no facts are pled that indicate that there is a relationship between defendants' compensation on the one hand, and the settlements with the agencies or the

alleged wrongdoing at the call centers on the other.  Plaintiffs have also failed to allege facts that raise a plausible inference that there was no justification for defendants' compensation.").

And in *Pfizer*, the court held that merely pleading that a defendant received his ordinary salary and benefits while breaching a term of his employment or neglecting a fiduciary duty owed to the employer is not sufficient to establish the causal connection required for disgorgement of routine compensation that was not inflated in any way by the alleged misconduct.  *In re Pfizer Inc. Shareholder Derivative Litig.*, 722 F. Supp. 2d at 465-66 (noting that "the only enrichment alleged by plaintiffs consists of defendants' salaries, benefits, and unspecified bonuses," not "compensation . . . of extraordinary magnitude," and rejected the idea that "the mere retention of directors' and officers' ordinary compensation can sustain an unjust enrichment claim predicated on allegations that these defendants breached their fiduciary duties").

In this case, Henkel America has not pointed to any record evidence to rebut Bell's testimony that he received favorable performance reviews and was awarded a bonus for meeting or exceeding the established annual goals for his division.  And Henkel America has not shown how anything that Bell did that was related to the Knight-Henkel negotiations materially impaired the performance of his usual duties.  Perhaps, had a deal been concluded that turned out to be an economic loss for Henkel US, and had Bell actually received the bounty that Knight promised him upon conclusion of the deal, then Henkel America could proceed on its self-dealing claim and recover damages to the extent of its actual economic disappointment or Bell's ill-gotten gains.  But in this case, despite its empty assertions that even the investigation of the deal was a waste of Henkel's time and resources, Henkel America has not identified any actual loss that it sustained other than the payment of Bell's usual compensation.   It has not suggested that any component of that compensation was paid out to Bell based on anything he did that related to the negotiations

(i.e., it has not suggested that he received anything like a "finders fee" or similar incentive for scouting the deal).

As one Connecticut court aptly observed, "[w]here the breach of contract claim comes up short is in its failure to allege actual damages caused by the breach, as required by the fourth element. In Connecticut, proof of damages is an essential element of a claim for common law breach of contract." *Nwachukwu v. Liberty Bank*, 257 F. Supp. 3d 280, 293 (D. Conn. 2017). And the plaintiff also has failed to advance evidence to show that it was deprived of any tangible expected benefit of the employment contract. *See id.* at 296 ("In a breach of the implied covenant of good faith and fair dealing, the defendant's bad faith actions injure the right of the other to receive the benefits of the agreement. Plaintiff has not pleaded any facts as to which contract 'benefits' he has not received, nor what harm this has caused him.").

"In a breach of contract action, the causation requirement focuses on whether a loss may fairly and reasonably be considered as arising naturally, i.e., according to the usual course of things, from such breach of contract itself." *Theodore v. Lifeline Sys. Co.*, 173 Conn. App. 291, 306 n.5, 163 A.3d 654, 663 n.5 (2017) (quotations omitted). Accordingly, "the plaintiff [bears] the burden of proving that [the defendant's] conduct was a cause in fact of the injuries for which compensation was sought." *Ibid.*

In this case, Henkel America has failed to sustain that burden. It has not put forth evidence demonstrating that any breach of the noncompetition, nondisclosure, or conflict of interest proscriptions in the employment contract had any influence on the ordinary compensation that Craig Bell received during 2014. And it has not rebutted Bell's testimony that his salary and bonus payments were determined entirely by the terms of his employment agreement and Henkel's performance incentive bonus plan, which did not comprise any component or formulae relating to

the scuttled Knight-Henkel deal or Bell's involvement in introducing Knight and its principals to Henkel.

The breach of contract counts must be dismissed.

## C.  Derivative Counts (VI-VIII)

Henkel America concedes in a footnote to its response, and the defendants concur in their briefing, that Counts VI through VIII for tortious interference with a contract and "aiding and abetting" breach of contract are "entirely derivative of the breach claims."  The parties agree that if the substantive claims for breach of contract cannot proceed then neither may those derivative claims.  Therefore, Counts VI through VIII will be dismissed.

## D. Unjust Enrichment (Count IX)

Henkel America may not proceed on a theory of unjust enrichment because it is undisputed that an express written contract of employment covered the entire subject of the parties' dispute in this case.  It is well settled under Connecticut law that "the equitable remedy of unjust enrichment is not available to a plaintiff if there was in fact a contract between the parties . . . although both theories may be pleaded separately in a complaint."  *Connecticut Light & Power Co. v. Proctor*, 118 A.3d 702, 705 (Conn. App. Ct. 2015), *aff'd*, 152 A.3d 470 (Conn. 2016).  Alternative pleading of contractual and quasi-contractual theories routinely is permitted in the early stages of litigation when the existence of a contract is uncertain or may be contested by the defendants.  But this case is beyond that stage, and the undisputed record evidence forecloses any latitude for alternative theories of liability at trial.

Moreover, for the reasons noted above, Henkel America cannot establish a causal link between Bell's conduct and the payment of his routine compensation.  That link is essential to

claims of unjust enrichment and breach of contract alike. *Marsteller*, 2013 WL 4781786, at *9-10.

### D. Breach of Fiduciary Duty (Count V)

As Henkel America points out, the defendants' motion more properly should be styled as a motion for "partial" summary judgment, because the defendants did not challenge Count V of the complaint, which alleged that Bell breached a "fiduciary duty of candor and loyalty" that he owed to Henkel. The defendants also did not address that count substantively in their reply. Therefore, the question whether it should be dismissed on this record is not properly before the Court.

Nonetheless, that count probably must suffer the same fate as the rest, because the applicable substantive law would require the plaintiff to prove that any supposed breach was the proximate cause of the alleged damages incurred. *E.g.*, *Chioffi v. Martin*, 186 A.3d 15, 32 (Conn. App. Ct. 2018) ("The elements which must be proved to support a conclusion of breach of fiduciary duty are: '(1) that a fiduciary relationship existed which gave rise to a duty of loyalty[,] an obligation to act in the best interests of the plaintiff, and an obligation to act in good faith in any matter relating to the plaintiff; (2) that the defendant advanced his or her own interests to the detriment of the plaintiff; (3) that the plaintiff sustained damages; and (4) *that the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty*.'" (quoting *Rendahl v. Peluso*, 173 Conn. App. 66, 100, 162 A.3d 1, 22 (2017) (emphasis added; alterations omitted)).

Moreover, Count V may be considered as pleading a claim in tort, which may not fall within the scope of the parties' choice-of-law contractual agreement. Because neither party has discussed these issues, the Court will direct the parties to submit supplemental briefs addressing (1) which jurisdiction's substantive law governs Count V of the complaint; (2) what evidence in

the record establishes that Bell owed any fiduciary duty recognized under the applicable law; and (3) what evidence in the record establishes that the alleged damages comprising Bell's salary and benefits paid during 2014 were proximately caused by the alleged breach of duty.  *See* Fed. R. Civ. P. 56(f)(2).

### III.  Conclusion

The undisputed material facts establish that the plaintiff is not entitled to relief on any of its claims challenged by the defendants, and the defendants are entitled to a dismissal of Counts I through IV, and VI through IX of the complaint.  Also, with the exception of a challenge to Count V, the motion and response fully set forth the arguments, and oral argument will not assist in the disposition of the motion.

Accordingly, it is **ORDERED** that the Court will decide the motion for summary judgment on the papers, *see* E.D. Mich. LR 7.1(f)(2), and the hearing scheduled for January 10, 2019 is **CANCELLED**.

It is further **ORDERED** that the defendants' motion for summary judgment (ECF No. 31), considered as a motion for partial summary judgment, is **GRANTED**.  Counts I through IV and VI through IX of the complaint are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the parties must submit supplemental briefs, **on or before December 27, 2018**, addressing (1) which jurisdiction's substantive law governs Count V of the complaint; (2) what evidence in the record establishes that Craig Bell owed any fiduciary duty recognized under the applicable law; and (3) what evidence in the record establishes that the alleged damages comprising Bell's salary and benefits paid during 2014 were proximately caused by the alleged breach of duty.  No other or new arguments may be addressed.  The briefs must conform to E.D. Mich. LR 7.1(d), may not include footnotes, and must not exceed five pages.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   December 17, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on December 17, 2018.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI